## HOSKINS v. OTIS ELEVATOR CO.

(Circuit Court of Appeals, Eighth Circuit. November 27, 1926.)

No. 7222.

1. **Negligence** ⟐⟐55—**Builder of passenger elevator is not liable for defect, unless reasonable prudence would have discovered and remedied it.**

The builder of a passenger elevator is not liable for an injury caused by the falling of the car because, as disclosed by the accident, a device could have been made which would have obviated the particular defect which caused the particular accident, unless it is further shown that reasonable prudence would have discovered this defect and remedied it.

2. **Negligence** ⟐⟐55—**Builder of passenger elevator held not liable for injury caused by falling of car through failure of safety device, of approved design, to work.**

The builder of a passenger elevator *held* not liable for an injury caused by the falling of the car, where the safety device, designed to prevent such falling and stop the car, was of approved pattern in general use, and was not shown to have ever before failed to work efficiently.

In Error to the District Court of the United States for the Southern District of Iowa; Colin Neblett, Judge.

Action at law by Richard G. Hoskins, administrator, against the Otis Elevator Company. Judgment for defendant, and plaintiff brings error. Affirmed.

William Emory Miller, of Des Moines, Iowa, for plaintiff in error.

Jesse A. Miller, of Des Moines, Iowa (E. J. Kelly and Oliver H. Miller, both of Des Moines, Iowa, on the brief), for defendant in error.

Before SANBORN, STONE, and KENYON, Circuit Judges.

STONE, Circuit Judge. This is a suit for a death caused by the fall of a passenger elevator in the Randolph Hotel at Des Moines on March 24, 1923. From a judgment entered on a verdict directed for the defendant, plaintiff sues this writ of error.

The defendant herein was neither owner nor operator of the hotel, but is engaged in the business of manufacturing and installing passenger elevators, and the elevator in question was made and installed by it. Appellee contends that it owed no legal duty of care as to construction, installation or maintenance of this elevator to passengers who might use it. It contends, also, that there was a legal break in the causal connection, even if it were negligent as alleged, because an independent human agency intervened between its alleged negligence and the accident resulting in the injury. In the view which we take of the evidence, we find it unnecessary to determine such contentions.

The second amended petition, as amended, alleged ten specifications of negligence, as to character of construction or maintenance, relating to various parts of the elevator machinery, which may be summarized as follows:

(1) Cables—defective, unsafe and insufficient strength—pulled loose—otherwise would have stalled motor.

(2) Cables—not strong enough to withstand motor pull.

(3) Cables—defectively attached to cage.

(4) Fuses—too high amperage—lower would have blown out.

(5) Safety device—tangled or fouled.

(6) Safety device—defectively designed—(a) frame too far away to keep governing cable in grooves on drum and thereby prevent overlapping or fouling—(b) not far enough away to prevent cable wedging between spool and frame—frame negligently installed.

(7) Safety device—no effective device to keep governing cable in grooves which was essential to its proper operation.

(8) Carbon contact clamps—unsafe, permitted carbon contacts to fall out.

(9) Counterweight stools—not set when counterweight cables renewed (a week before accident), but left in condition where would not operate switch breaker.

(10) Safety device—no provision against turning spool in wrong direction by T-wrench—if wrongly turned would tend to foul governing cable. Must be inserted from above, so one using could not see that it was being wrongly wound.

At the end of plaintiff's evidence, the court sustained a demurrer to all of the above grounds except 3 and 5, above, and, at the close of all the evidence, directed a verdict upon these two.

We think the court was right in sustaining the demurrer and directing a verdict as to the following allegations and for the fol-

lowing reasons: The allegations of negligence (1 and 2 above), charging that the cables which supported the car were insufficient in strength and defective, were not proven because the evidence shows that these cables did not break.

The allegation of negligence (3) that the above cables were defectively attached to the cage, because of insufficient or improper babbitting into the shackles attached to the car, is not sufficiently proven either as a fact in itself or as being the cause of the accident or if they had been properly babbitted, as being able to prevent the accident. The strain put upon these cables and shackle joints was such as would not and could not occur in the normal operation of the elevator and there were at least two electrical safety devices (the drum and counterweight breakers) which would have prevented an abnormal strain, such as occurred here, from ever being placed upon these cables or shackle joints.

The allegation of negligence (4) concerning the fuses, is unsupported because the evidence fails to show that the fuses in use at the time of the accident were those installed by defendant or such as defendant recommended or instructed to be installed. In fact, the evidence is to the contrary.

The allegation of negligence as to the carbon contact clamps (8) was not established as a question for the jury because, even if those clamps were negligently constructed and designed, yet the evidence is clear that it was the duty of the engineer of the hotel company to care for them, and while the absence of this carbon was a contributing cause to the accident, the evidence shows that the car did stop and remain stationary for some time after these contacts "froze" and that the negligence from that source was insulated by the later independent act of the hotel clerk (for the acts of whom the elevator company was not responsible) in closing the circuit when he could have seen the condition of the clamps at the time.

The allegation of negligence (9), as to the counterweight stools, is unproven as a cause of the accident because the evidence shows (a) that the switch breaker did work and the car stopped; (b) that the drum slack cable circuit breaker operated; and (c) it is not shown that the stools did not hold the counterweight circuit breaker in place until the cables were torn loose from the car and the other counterweights fell, at which time no electrical device could have prevented the fall.

The evidence fails to show any defect in the electrical safety appliances, but, on the contrary, conclusively shows that some, if not all, of them did work. To our minds, there is no escape from the conclusion that the sole failure of these electrical devices to be effective in preventing the accident was caused by the act of the hotel clerk, who nullified their effect by holding in place the circuit closer until the car had torn loose and started to fall.

This leaves for consideration the allegations (5, 6, 7 and 9), concerning the mechanical safety device. This device was entirely disconnected from the motive power and was designed to operate automatically to meet one and only one danger. It was designed to operate only in case the car descended at an abnormally rapid speed. It was the only device which could prevent the car falling if the power devices failed through any cause. The construction and purpose of this device and its condition at the time of accident and its relation to the accident are undisputed. It was attached to the bottom of the car floor between two steel channels. It consisted of a grooved metal spool from the ends of which projected rods reaching to the guide rails along which the elevator moved. Into one end of this spool was inserted and attached the end of a bronze cable about one-half inch in diameter. This cable wound around the spool in the grooves and then passed to the top of the shaft where there was a governor with jaws which could firmly engage this cable. The method of operation was that the governor could be regulated so that if the car descended at an abnormal speed, the governor jaws would firmly clamp the cable, causing it to unwind the spool, and the unwinding of the spool had the effect of thrusting out and closing clamps upon the guide rail which would stop the car within a few feet and hold it firmly stationary until the device was released. The evidence conclusively shows that when this car started to fall, the governor functioned as intended, that the governor jaws clamped firmly on the cable but that the cable was torn through the jaws because the spool would not turn, even when subjected to this great pressure. The reason it would not turn, and the sole cause which prevented the safety device from fully functioning was that there was a kink in the bronze cable around the spool, that kink being between the spool and one of the channels. The only ways in which this defendant could be connected with that kink in the cable was either (1) that its agent in renewing the governor cable, about nine months before the accident, had improperly wound this bronze cable on the spool, or (2) that the design of the part of the device un-

der the car in connection with the spool was negligently defective. As to the first, we think the evidence is deficient in showing that this part of the safety device was in the same condition and had not been changed or tampered with or operated during the nine months before the accident. As to this point, the evidence of the plaintiff is entirely silent and the evidence of the defendant is that there had been two or three adjustments of that device during that period by persons not connected with defendant.

As to the second point, referring to negligent design: If the bronze cable had been properly wound upon the spool when defendant finished its repairs nine months before the accident, nothing could have changed that condition or brought about the kink in the cable except the intervention of a human agency. This intervention could come about in but one of two ways to cause such a result. The first would be that if any one inspecting the device to ascertain if it were in working order, should pull out this cable, the kink might occur, if it were not properly rewound into the grooves on the spool. Second, if in the operation of the elevator, the safety device should work to stop the car, it would be necessary to loosen this cable in order to release the device and to wind up the cable again on the spool. Outside of its operation by the governor, in the emergency of stopping the car, this spool could be wound or unwound only in one of two ways. If the car stopped near enough to the bottom of the shaft for one standing below to reach the spool, it could be manipulated there by a screw driver or small bar which could be inserted in small openings on the outside of one end of the spool. The other way, was through a small hole in the floor of the car through which a T-wrench, furnished for the purpose, could be inserted into the winding and unwinding cogs on the end of the spool. If the car were at a distance from the bottom of the shaft, this was the only way in which the device could be released so that the car could be moved. The testimony is that a kink, such as was found here, might be caused, if the T-wrench were turned in the wrong direction or, if the cable were wound on the spool from below and care not taken to see that it followed the grooves properly. This result would be caused by the facts that the cable had a tendency to spring out from the groove, that the pressure of a roller underneath the spool would have a tendency to cause this spring to be at the top of the spool and that the channels were so located as to the spool, that they would permit a kink to occur but would not leave passage for that kink if it did occur. The evidence is that there was no mechanical or engineering reason why the channels could not have been placed a little further away from the spool and that if they had been so placed, a kink, such as this was, would not have interfered with the functioning of the device.

As to the use of the T-wrench, the evidence is, that whether it should be turned clockwise or counterclockwise to wind the spool, depended on the construction of the particular elevator shaft, but that this elevator was so installed that the T-wrench would have to be turned counterclockwise to wind the spool and that this was contrary to the usual mechanical and engineering custom, which was to wind clockwise in tightening any device. The evidence is also that there were no markings or instructions on the key or on the slot in the car floor to direct in which way the wrench should be turned. The evidence is, that the only absolutely sure and safe way to rewind this cable on the spool after the device has acted and been released, is for the person to go beneath the car and turn the spool with a screw driver or bar while holding the cable taut and carefully seeing that it smoothly followed the grooves on the spool, or, if the winding was done by the T-wrench, to have a second person below to see that the cable wound smoothly in the grooves. The weight of the testimony is that the user of the T-wrench could not see at all how the cable wound and that a visual inspection from below would not reveal a kink which would occur near the top of the spool.

[1] The most that can be said of this evidence, in favor of plaintiff, is that this device might have been constructed so as to prevent the kinking in the cable, which was, apparently, the reason that this safety device did not work and stop the elevator. But the fact that a device could have been made which would have obviated the particular defect which caused this particular accident is only one link in the proof that it was negligence not so to construct the device. The further important link is to show that reasonable prudence would have discovered this defect and have remedied it. Often, the occurrence of an accident clearly reveals a defect which was concealed or unsuspected before. Due care, in a legal sense, does not require an uncanny foresight.

[2] In this evidence, there is no suggestion that any cable on such a device had ever kinked before or that the possibility of such oc-

curring had occurred to any one. To insure the smooth working of this portion of the device (which means the ready unwinding of the cable from the spool) the cable was fairly stiff, the spool was grooved for its reception and a roller was placed just below the spool to guide into and confine the cable in the grooves on the spool. Also, two channel irons, which formed the hanger for the car, were on either side of the spool near the top and tended to further control the cable at those points. Evidence by witnesses for plaintiff is that additional rollers at the sides would have prevented proper inspection of the device.

Plaintiff introduced three main witnesses who testified, as experts, concerning this device. Each of these qualified as having extended knowledge and practical experience with elevators and forms of elevator construction. One of them, J. D. Seaman, said:

"It is a type that is in general use and has been ever since I have known anything about elevators. The kind of a spool you have there on the safety plank is in general use and has been ever since I have had any knowledge of elevators. The spool and plank was an approved device for a safety device on an elevator."

Another, Herman Heise, testified:

"I testified as a witness in the case of Lois Hoskins against Hotel Randolph Company, tried in the district court of Polk county. I was asked whether this safety plank is a proper safety plank and a proper safety device, and answered 'Yes.' I was asked: 'It is correct mechanically?' And I answered: 'The same as the rest of them (safety planks) that were used.'"

The third, John Burgeson, testified:

"I have several times examined that car safety plank that was on that Hotel Randolph elevator. I recognize it here as Exhibit No. 21. It is of a type which has been in use for a good while. * * * I have previously testified that in my experience this type of safety has always worked well. I would not change my testimony on that. This type of safety has always worked right in my experience. The safeties on the elevators at the Valley National Bank Building are on the same principle and work all right if properly taken care of."

Considering all of this evidence, we are convinced that no negligence in the construction or installation of this safety device was shown. The result is that the trial court was right in denying recovery and the judgment should be and is affirmed.